*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re | ) | Case No. 21-21429-E-13 |
| | ) | Docket Control No. DNL-6 |
| JAMIE HOWELL, | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**This Memorandum Decision is not appropriate for publication.**
**It may be cited for persuasive value on the matters addressed.**

## MEMORANDUM OPINION AND DECISION

### APPLICATION FOR FINAL APPROVAL OF FEES AND COSTS FOR DESMOND, NOLAN, LIVAICH & CUNNINGHAM, ATTORNEYS FOR THE CHAPTER 7 TRUSTEE

Nikki Farris, the former Chapter 7 Trustee, prior to this Bankruptcy Case being converted to one under Chapter 13, ("Applicant") makes a First and Final Request for the Allowance of Fees and Expenses in this case for services provided by Desmond, Nolan, Livaich, & Cunningham ("DNLC"), the Trustee's attorneys in this Case.

Fees are requested for the period December 22, 2021, through November 3, 2022. The order of the court approving employment of DNLC was entered on January 4, 2022. Dckt. 70. Applicant requests fees to be approved to pay DNLC in the amount of $20,215.50 and costs in the amount of $520.92.

/ / /

**Chapter 13 Trustee's Nonopposition**

Chapter 13 Trustee, David P. Cusick ("Chapter 13 Trustee"), filed a nonopposition on March 15, 2023, Dckt. 215, stating they do not oppose compensation for DNLC, and that the services performed were needed and reasonable.

**Debtor's Opposition**

The debtor, Jamie Howell ("Debtor"), filed an opposition to the Motion on March 27, 2023. Dckt. 221. Debtor states the fees are not reasonable, much of the work was duplicative of work performed by other professionals, including Loris Bakken, Esq., the Trustee's first attorney in this Case ("Former Attorney"), and that the work did not benefit the estate. Debtor's Opposition includes the grounds that:

1. Prior attorney's fees to Chapter 7 Trustee's Counsel:

    a. Applicant's prior counsel, Loris Bakken, had already received an award of attorney's fees in the amount of $10,430.

2. Different billing rates:

    a. The Application to Employ DNLC was "fraught with deception." The original application had lower billing rates than what the attorneys billed for. If Debtor knew DNLC would increase their billing, they would have objected to the employment.

    b. This "deception" relates to the Application to Employ which stated the then current billing rates were $425 an hour for Mr. Cunningham and Mikayla Kutsuris at $175 an hour. Shortly after the employment was authorized in January 2022, Mr. Cunningham raised his hourly rate to $450 and then to $495. Additionally, Ms. Kutsuris' hourly rate increased to $195, with all of her billings being at $195 an hour and none at $175.

    c. With respect to this "deception," the Debtor computes that the higher rates result in $665.50 more billed for Mr. Cunningham and $830 more for Ms. Kutsuris than if the original amounts stated in the Application were used.

At this juncture, the court notes that Debtor appears to be under a misconception that the parties set the hourly rate a professional charges, and such is then locked in when the court authorizes the employment of a professional. That is not the case, unless the court itself sets the rate of compensation in the order authorizing employment (which nevertheless continues to be subject to adjustment as provided in 11 U.S.C. § 328). The order authorizing the employment of DNLC

2

expressly states:

> 3.    No hourly rate or other term in the application papers is approved unless unambiguously so stated in this order or in a subsequent order of this court.

Order, ¶ 3; Dckt. 70.  Said order does not state any hourly rate for the services rendered by DNLC.

3.    **Duplicative work:**

   a.    DNLC is billing for assessing the property and homestead and preparing the property for marketing by the broker.  However, any time spent on this would be minimal as arrangements were never made for the broker to see the property.  Additionally, DNLC is billing for time spent on turnover of the property, however, this is what the real estate broker should have been employed for.

4.    **Not a benefit to estate:**

   a.    1.2 hours of DNLC's billed "case administration" was spent communicating regarding substitution and case status.  Debtor argues this did not benefit the estate and time should not be charged informing a new attorney on the status of the case.

5.    **Duplicative fees:**

   a.    Much of the work performed by DNLC was also performed by the prior counsel, Ms. Bakken.  Additionally, the amount of time spent on the Motion for Turnover and Convert was not reasonable due to the length of their oppositions and novelty of the issues.

6.    **Asset Disposition and Settlement / Non-binding:**

   a.    The majority of communications related to a proposed buyback agreement took place between Ms. Bakken and Debtor's Counsel.  When DNLC substituted as counsel, they "refused to honor any buyback agreement" negotiated with Ms. Bakken.  Additionally, DNLC should not be compensated for time spent communicating with prospective buyers because this is the job of a real estate broker.

**DNLC's Response**

DNLC filed a response on April 4, 2023.  Dckt. 225.  DNLC states:

1.    **Duplicative Billing Entries:**

   a.    There are no duplicative billing entries, as the fees awarded to Ms. Bakken were up until December 20, 2021, and DNLC began billing on December 22, 2021.

2.    **Billing rates:**

   a.    The court did not approve specific billing rates in the application.  However, DNLC inadvertently included old rates.  Yet, nothing precludes DNLC from adjusting its rates from time to time.

3. Everything else:

    a. Real estate work that was performed was contacting a potential purchaser to gauge interest given the legal and practical difficulties of the properties. Additionally, the time that Debtor finds unreasonable in connection with the litigation was due to Debtor's failure to cooperate, which led to multiple rounds of briefing and hearings for multiple hearing dates.

## APPLICABLE LAW

**Reasonable Fees**

A bankruptcy court determines whether requested fees are reasonable by examining the circumstances of the attorney's services, the manner in which services were performed, and the results of the services, by asking:

    A. Were the services authorized?

    B. Were the services necessary or beneficial to the administration of the estate at the time they were rendered?

    C. Are the services documented adequately?

    D. Are the required fees reasonable given the factors in 11 U.S.C. § 330(a)(3)?

    E. Did the attorney exercise reasonable billing judgment?

*In re Garcia*, 335 B.R. at 724 (citing *In re Mednet*, 251 B.R. at 108; *Leichty v. Neary (In re Strand)*, 375 F.3d 854, 860 (9th Cir. 2004)).

**Lodestar Analysis**

For bankruptcy cases in the Ninth Circuit, "the primary method" to determine whether a fee is reasonable is by using the lodestar analysis. *Marguiles Law Firm, APLC v. Placide (In re Placide)*, 459 B.R. 64, 73 (B.A.P. 9th Cir. 2011) (citing *Yermakov v. Fitzsimmons (In re Yermakov)*, 718 F.2d 1465, 1471 (9th Cir. 1983)). The lodestar analysis involves "multiplying the number of hours reasonably expended by a reasonable hourly rate." *Id.* (citing *In re Yermakov*, 718 F.2d at 1471). However, both the Ninth Circuit and the Bankruptcy Appellate Panel have stated that departure from the lodestar analysis can be appropriate. *See id.* (citing *Unsecured Creditors' Comm. v. Puget Sound Plywood, Inc. (In re Puget Sound Plywood)*, 924 F.2d 955, 960, 961 (9th Cir. 1991) (holding that the lodestar analysis is not mandated in all cases, thus

4

allowing a court to employ alternative approaches when appropriate); *Digesti & Peck v. Kitchen Factors, Inc. (In re Kitchen Factors, Inc.)*, 143 B.R. 560, 562 (B.A.P. 9th Cir. 1992) (stating that lodestar analysis is the primary method, but it is not the exclusive method)).

**Reasonable Billing Judgment**

Even if the court finds that the services billed by an attorney are "actual," meaning that the fee application reflects time entries properly charged for services, the attorney must demonstrate still that the work performed was necessary and reasonable. *In re Puget Sound Plywood*, 924 F.2d at 958. An attorney must exercise good billing judgment with regard to the services provided because the court's authorization to employ an attorney to work in a bankruptcy case does not give that attorney "free reign to run up a [professional fees and expenses] tab without considering the maximum probable recovery," as opposed to a possible recovery. *Id.*; *see also Brosio v. Deutsche Bank Nat'l Tr. Co. (In re Brosio)*, 505 B.R. 903, 913 n.7 (B.A.P. 9th Cir. 2014) ("Billing judgment is mandatory."). According to the Court of Appeals for the Ninth Circuit, prior to working on a legal matter, the attorney, or other professional as appropriate, is obligated to consider:

> (a) Is the burden of the probable cost of legal [or other professional] services disproportionately large in relation to the size of the estate and maximum probable recovery?

> (b) To what extent will the estate suffer if the services are not rendered?

> (c) To what extent may the estate benefit if the services are rendered and what is the likelihood of the disputed issues being resolved successfully?

*In re Puget Sound Plywood*, 924 F.2d at 958–59 (citing *In re Wildman*, 72 B.R. 700, 707 (N.D. Ill. 1987)).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## REVIEW OF CHAPTER 7 CASE
## AND SERVICES PROVIDED[1]

This Bankruptcy Case began as a voluntary Chapter 7 Case filed by Debtor Jamie Howell on April 19, 2021. The Case was originally assigned to the Hon. Christopher M. Klein of this court, and transferred to the undersigned judge when it was converted to one under Chapter 13. The Trustee was initially represented by other counsel, Loris Bakken, Esq., who substituted out February 1, 2022, when she accepted employment by a governmental agency which precluded her continued employment as counsel for the Trustee. Order; Dckt. 84. DNLC substituted in at that time, and its employment was authorized by the court effective as of December 22, 2021. Order; Dckt. 89.

The court allowed the Trustee's Former Counsel attorney's fees in the amount of $10,430.00 and costs of $101.60 for her services provided to the Trustee. Order; Dckt. 95.

**Debtor's Motion to Dismiss Case**
**Filed July 26, 2021**

On July 26, 2021, the Debtor filed a Motion to Dismiss her Voluntary Chapter 7 Case. Motion; Dckt. 20. The grounds stated with particularity in the Motion include:

> In this case, Debtor filed her petition for bankruptcy under Chapter 7 under the good faith belief that the assets in the name of her living trust, established in January 19, 2018 and converted to an irrevocable trust on June 3, 2020, were not part of her bankruptcy estate.
>
> Based thereon, Debtor believed that she did not have sufficient assets to repay creditors.
>
> After filing her petition, the Trustee, Nicole Farris, indicated that she did not regard the trust as an irrevocable trust and would liquidate trust assets to satisfy Debtor's debts.
>
> The Trustee's position prompted Debtor to seek further legal advice on the matter of characterization of trust assets.
>
> Debtor now believes that she is able to liquidate trust assets in order to pay

---

[1] The court finds it necessary to carefully review the Docket in this case and the proceedings during the period the fees are requested to properly evaluate the requested fees. The court having to do such, that review is included in this Decision.

her creditors in full.

>    Had Debtor known that trust assets were capable of being sold, Debtor would not have filed bankruptcy.

Mtn. Dismiss, p. 2:1-13; Dckt. 20.  In reading the above, the stated grounds are that Debtor believed that she had transferred her assets in a trust created for her own benefit, the trust was made irrevocable in June 2020, and the trust created by Debtor for her own benefit protected her assets from claims of creditors, including those having claims when she chose to file bankruptcy April 19, 2021 (nine months later).  This is supported by Debtor's testimony under penalty of perjury where she states she believed that she had made her assets protected from claims of her creditors once she converted the trust to be irrevocable in June 2020.  Dec.; Dckt. 22.

   The court denied the Motion to Dismiss.  Order; Dckt. 45.

**Trustee's Supplemental Employment Motion**
**Filed July 21, 2022**

   On July 21, 2022, Applicant  filed a Supplemental Application for Employment, stating that a potential connection of the case to an attorney, Joan Madeiros, was identified and that the Supplemental Application was filed to avoid any confusion whether issues relating to Ms. Madeiros were included in the original employment authorization.  Supp. Mtn.; Dckt. 99.  The issues being investigated related to trust documents drafted by Ms. Madeiros for the Debtor, into which the Debtor transferred assets pre-petition.  This Supplement Application was granted by the court.  Order; Dckt. 103.

**Trustee's Motion For Turnover**
**Filed July 26, 2022**

   On July 26, 2022, the Trustee filed a Motion for Turnover, requesting an order for the Debtor to turnover the following pieces of real property:

♦    5404 Forbestown Road, Forbestown, CA

♦    9 & 11 Charley Lynds Way, Forbestown, CA

♦    Rental Agreements relating to those properties.

Motion; Dckt. 104.

7

The Motion for Turnover states that the Debtor listed the 5403 Forbestown Road property on her schedules, listing her interest as a one-half "equitable interest." *Id.*, ¶ 2. The Debtor also included the Lynds Way property on the Schedules. *Id.* The Trustee further asserted that the Debtor owns full title and interest in these properties, purportedly through the Jamie Lee Howell Living Trust. The Trust is identified as being revocable and with the Debtor as the sole trustee and beneficiary. *Id.*, ¶¶ 6, 7.

It is further alleged in the Motion that on June 3, 2019, the Debtor attempted to make the Trust irrevocable, but failed to do so as the Debtor did not have this authority. After the attempt, Debtor retained possession and control of the Trust Assets, and did not obtain a separate tax identification number and bank accounts for any such irrevocable trust. *Id.*, ¶ 9.

The grounds stated in the Motion for Turnover by the Chapter 7 Trustee include the following:

> 15. The Trustee has advised the Debtor, through counsel, of her intent to market and sell the Subject Property. In response, the Debtor has threatened to move to convert this case to one under Chapter 13.
>
> The Subject Property is property of the estate that has consequential value and that the Trustee may use and administer for the benefit of the estate's creditors. 11 U.S.C. §§ 363, 541(a)(1). In that same vein, any rental payments paid to the Debtor post-petition are property of the bankruptcy estate. The Debtor has thus far failed to turnover the Subject Property to the Trustee and has been slow to respond to her inquiries as to whether either Subject Property is vacant, subject to any valid lease, or otherwise ready to market and sell. It remains unclear whether anyone has a legitimate right to be residing in the Forbestown Property. Turnover is necessary for the Trustee to effectively market the Subject Property and take any related action.

*Id.*, ¶ 15, and p. 4:7-14.

In the Opposition to the Motion for Turnover, Debtor's counsel's arguments (no declaration provided in support thereof) included:

> However, on July 29, 2022, the Debtor filed a motion to convert the Case to a Chapter 13 Case. She has secured gainful employment and is eligible as a Chapter 13 debtor. The hearing on the Motion to Convert is set for August 24, 2022 at 10:00 a.m.. She has updated her income on her Amended Schedule I, filed July 29, 2022, in accordance with the rules for a Chapter 13 bankruptcy. (See Exhibit A.) . . .
>
> Here, the Debtor qualifies as a debtor under Chapter 13. She now has gainful employment and has disclosed her income on her Amended Schedule I

8

1     accordingly. (Ex. A.) She has not previously converted her case to Chapter 13.

2          Therefore, the Motion for Turnover should be denied.

3  Opp., p. 2:6-10, 2:22-25; Dckt. 113.  Other pleadings filed in connection with Debtor's Motion

4  filed near the same time are supported by Declarations providing testimony concerning the above

5  facts.

6          The court deemed the Motion for Turnover to be a complaint and the Clerk of the Court

7  opened an adversary proceeding for such.  Order, Dckt. 152; and Adv. Pro. 22-02099 opened by

8  the Clerk.   Additionally, the court ordered the Adversary Proceeding stayed until further order of

9  the court.  *Id.*; Order, Dckt. 5.  There have been no "further orders."  On November 9, 2022, the

10 Adversary Proceeding was transferred to the undersigned Bankruptcy Judge. Order, Dckt. 9.

11
   **Debtor's First Motion to Convert Case**
12 **Filed July 27, 2022**

13         Debtor then filed a Motion to Convert on July 27, 2022.  Mtn. Convert, Dckt. 109.  The

14 grounds stated are that Debtor has secured employment and qualifies as a debtor in a Chapter 13

15 Case.  *Id*.

16         In the Opposition to the Motion to Convert, the Chapter 13 Trustee asserts various

17 grounds, which include the following:

18         2. The Debtor did not appear for four 341 meeting of creditors held on: (1) July 1,
           2021; (2) August 18, 2021; (3) September 15, 2021; and (4) October 4, 2021. The
19         Debtor appeared for the 341 meeting of creditors held on June 16, 2021, and
           November 10, 2021.
20
           3. Among the scheduled assets of the Debtor's bankruptcy estate is the Debtor's
21         interest in 5404 Forbestown Road, Forbestown, CA 95941, APN
           073-180-038-000 ("Forbestown Property") and 9 & 11 Charley Lynds Way,
22         Forbestown, CA 95941, APN 073-180-039-000, (a/k/a 9 and/or 11 Charles Lynd
           Way, Forbestown, CA 95941) ("Charley Lynds Property") (collectively "Subject
23         Property"). The Debtor did not initially disclose her interest in the Subject
           Property in her first Schedule A/B filed on April 19, 2021
24
           4. In her Amended Schedule A/B, filed as Doc. No. 57, the Debtor values the: (a)
25         Forbestown Property at $108,126.00 and (b) Charley Lynds Property at
           $325,000.00. The Debtor does not schedule any interest of a secured creditor in
26         the Subject Property, nor does the Debtor assert an exemption against either
           property. Title reports reveal a mortgage of $228,000.00 secured against the
27         Charley Lynds Property.

28 / / /

                                        9

5. The Debtor has also scheduled her interest in 5403 Forbestown Road, Forbestown, CA 95941 ("Homestead"), which she values at $65,774.00 and against which she claims an exemption in equal value.

6. The Trustee has determined that title to both the Forbestown Property and Charley Lynds Property appears to be vested solely in the Debtor who holds it in fee, purportedly through the Jamie Lee Howell Living Trust, dated January 19, 2018 ("Trust").

11. On August 4, 2022, the Debtor filed an Amended Schedule I. It provides that the Debtor is employed as a consultant with J & S Environmental Solutions. The Debtor's Amended Schedule I lists (among other sources of income) "net income from [a] rental property and from operating a business, profession, or farm" that totals approximately $5,200.00. See Doc. No. 114. Debtor's counsel has advised that the $5,200.00 is business income and that the Debtor is being paid as an independent contractor.

Opp.; Dckt. 118. The Trustee further argued that the Debtor did not provide a declaration to support the Motion to Convert, that the business income information required to be attached to Amended Schedule I was not attached, Debtor had misrepresented her assets and did not disclose claims secured by the property, and that Debtor's filing and prosecution of the Chapter 7 case had been in bad faith. *Id*.

Debtor filed a Reply, asserting grounds which were stated to show good faith, including that Debtor had a deal through former counsel for the Chapter 7 Trustee to purchase the non-exempt equity in the assets of the Bankruptcy Estate. However, before the agreement could be documented, the Trustee had obtained new counsel and that new counsel (DNLC) stated the Trustee would not be doing that deal. Reply, p. 2; Dckt. 124. This Reply includes:

The trustee claims that Ms. Howell did not participate in the 341 meetings. However, it is conveniently unclear that Ms. Howell did, in fact, appear at the initial 341 on June 16, 2021. Debtor's counsel appeared at the July 1, 2021 meeting of creditors but Debtor did not. Counsel represented that the Debtor was expected to be on the call. Debtor later advised she was having issues accessing the conference bridge. Debtor's counsel also notified the trustee that the Debtor's children had COVID and that she does not have phone signal at home in advance of the meeting on September 15, 2021, which was continued by agreement. (See Declaration of Stacie L. Power)

*Id*., p 3:7-13.

The trustee suggests that Debtor acted in bad faith by not disclosing properties in an irrevocable trust on her schedules. Debtor was informed and believed that the assets in the irrevocable trust were not 'her assets' and were not part of the estate. After reviewing the trust documents and discovering that the trust was converted to an irrevocable trust just shy of two years from the date of filing, Debtor

10

amended her schedules in good faith. This was an honest mistake and misunderstanding and the trustee has not presented any evidence, other than an unsupported assumption, that it was done in bad faith.

*Id.*, p. 3:15-21.[2]

The trustee asserts that the Debtor failed to provide leases and proof of ownership of the property at 5404 Forbestown Road. This is factually incorrect. Debtor advised trustee's counsel that there were no leases that she was aware of on any property. She advised that she co-owned the property with two others and provided the deed. (See the current Deed attached to the Declaration of Stacie L. Power.) She advised she believed there was a marijuana grow facility on the property and that she had asked a third party to clean it up.

*Id.*, p. 3:23-27, 4:1.

The trustee contends that the Debtor has not sufficiently updated her Schedule I to show "gross receipts, ordinary and necessary business expenses, and the total monthly net income." However, the Debtor's current Amended Schedule I is true and accurate. She is a 1099 contractor and hasn't incurred any expenses yet with her position. However, she has provided a statement confirming the existence of the contractor role. (See Exhibit A to attached declaration of Jamie Howell.) When the Schedule I is no longer an accurate depiction of this independent contractor work, she will amend her Schedule I accordingly.

*Id.*, p. 4:3-9.

The court denied without prejudice the First Motion to Convert on September 1, 2022. Order, Dckt. 133.

Though no transcript has been prepared for the September 1, 2022 hearing, it has been recorded and is on the court's Docket, Item 130.

---

[2] While stating that the Debtor had a "misunderstanding" of what her assets were, the Debtor did not file this case in *pro se*. Her current attorney is the attorney who represented her in the filing of this Bankruptcy Case and continuously in this Chapter 13 Case and in the pre-conversion Chapter 7 Case.. On Original Schedule A/B Debtor states under penalty of perjury that she has no legal or equitable interest in any real property. Dckt. 1 at 11. Debtor also states under penalty of perjury that she has no interests in any trusts, or equitable or future interests in any other property. *Id.*; Sch. A/B, ¶ 25. These are on the Schedules prepared with the representation of counsel.

Debtor does disclose on her Statement of Financial Affairs, *Id.* ¶ 19, that she transferred on March 1, 2018, "All real estate properties and business shares were transferred into this trust," which is identified as the "Jamie Lee Howell Living Trust-Irrevocable." *Id.*, p. 43. Clearly both Debtor and her counsel were aware of the trust, the transfers of properties, and the need to review the trust documents prior to this case being filed.

**Second Motion to Convert**
**Filed September 29, 2022**

The Debtor then filed the Second Motion to Convert (Dckt. 135) on September 28, 2022. In the Motion, Debtor recounts the challenges of COVID impacting her family and ability to find employment. Additionally, it is asserted that the Debtor's children's father has "squandered nearly all of their shared business assets out of retaliation for her leaving the relationship." 2nd Mtn, p. 2:1-6; Dckt. 135. Additionally:

> Initially Debtor did not include real properties held in trust on her schedules because she understood from previous counsel that, upon conversion of the trust to irrevocable, the assets in the trust were no longer her property. She did, however, disclose that she was the beneficiary of the trust which led to an inquiry by the Trustee.
>
> After consideration of the Trustee's position and further consult with counsel, Debtor amended her schedules to include the properties.
>
> Thereafter, Ms. Howell diligently sought employment and, once working, filed a motion to dismiss the instant case, which was denied.
>
> Prior to the instant motion being filed, Ms. Howell indicated her intent to convert to a Chapter 13. However, prior counsel for the trustee negotiated an agreement with the Debtor to purchase the unexempt assets of the estate instead ...
> . . .
> Unfortunately, amidst the finalization of the agreement, the trustee retained new counsel. After several months, current counsel reached out and said that, since there was never a signed agreement and there was nothing legally binding, the trustee would not be following through.
>
> During the extended period of time Debtor was waiting to hear from Trustee's counsel, Debtor's own financial situation further improved. Since filing, Debtor has married, her children have returned to school, she secured a well-paying consulting position as well as a contract with In Home Support Services ("IHSS") caring for her mother and is expecting another baby with her new husband. (See Declaration of Howell).
> . . .
> Per the Chapter 7 liquidation analysis, the payout of 25.49% to creditors under the proposed plan is greater than the Chapter 7 liquidation analysis of 23.31%.

*Id.*; p. 2:7-17, 3:1-8, 3:19-20,

The Chapter 7 Trustee and Tri Counties Bank opposed the Second Motion to Convert. The Trustee asserted that Debtor did not have income to fund a plan and had not provided evidenced that her Spouse could provide such funding. T'ee Opp., p. 3:15-26; Dckt. 143. Further, since Debtor had received her Chapter 7 discharge, such "advance relief" was not

allowed under Chapter 13 (the discharge being entered only after completion of the Plan) and conversion was not proper. *Id.*, p. 5:3-7.

The decision of the court was to convert the case to one under Chapter 13. Order, Dckt. 10. It further ordered that Debtor's initial Plan payment would be made by November 24, 2022. *Id.* The court's findings and conclusions are stated on the record for the October 26, 2022 hearing. *Id.* On the court's Docket is the audio recording of the hearing. Dckt. 127.

This Bankruptcy Case was converted to one under Chapter 13 on October 29, 2022.

**REVIEW OF DNLC BILLING RECORDS AND CHARGES
AND REQUEST FOR FEES AND COSTS
FEES AND COSTS & EXPENSES REQUESTED**

**Fees Requested**

DNLC provides a task billing analysis and supporting evidence for the services provided, which are described in the following main categories.

General Case Administration: DNLC spent 1.20 hours in this category. DNLC communicated with Trustee regarding substituting and case status.

Asset Marketing & Sales and Asset Analysis & Recovery: DNLC spent 19.70 hours in this category. DNLC expended time regarding the turnover and marking of real property.

Litigation & Contested Matters and Claims Administration and Objections: DNLC spent 55.70 hours in this category. DNLC researched, analyzed, and communicated regarding issues with the Trust, communicated with creditors regarding leans, litigated a motion for turnover, and contested Debtor's motions to convert the case.

Fee / Employment Applications: DNLC spent 1.70 hours in this category.

The fees requested are computed by DNLC by multiplying the time expended providing the services multiplied by an hourly billing rate. The persons providing the services, the time for which compensation is requested, and the hourly rates are:

| Names of Professionals and Experience | Time | Hourly Rate | Total Fees Computed Based on Time and Hourly Rate |
|---|---|---|---|
| J. Russell Cunningham, Attorney | 1.70 | $450.00 | $765.00 |
| J. Russell Cunningham, Attorney | 8.90 | $495.00 | $4,405.50 |

| Benjamin C. Tagert, Attorney | 30.90 | $225.00 | $6,952.50 |
| Mikayla E. Kutsuris, Attorney | 41.50 | $195.00 | $8,092.50 |
| **Total Fees for Period of Application** | | | $20,215.50 |

**Costs & Expenses Requested**

DNLC also seeks the allowance and recovery of costs and expenses in the amount of $520.92 pursuant to this application.

The costs requested in this Application are,

| Description of Cost | Per Item Cost, If Applicable | Cost |
| --- | --- | --- |
| Copying | $0.10 | $28.40 |
| Postage | n/a | $127.52 |
| Chase Card Services - U.S. Bankruptcy Court | $15.00 | $15.00 |
| Filing Fees | $350.00 | $350.00 |
| **Total Costs Requested in Application** | | $520.92 |

Given the allegations of deception, duplication of work, work that did not benefit the bankruptcy estate, and the like, the court provides the following determinations with respect to the legal services provided and reasonable fees, organized by the task billing categories.

**Review of Billing Records For
the Task Billing Groups**

In considering this Application, the court reviews the actual billings of DNLC, the attorney providing the services, the time billed, and the corresponding dollar amount of the fees for the service. The court reviews these by the Task Billing groupings (as required under the U.S. Trustee's Fee Billing Guidelines) provided by DNLC in its billing statements.

<u>Asset Marketing and Sales</u>

The fees for these services total $785.50, for which there are stated 3.5 billable hours. Ex. A, Task Billing Report; Dckt 208 at 2. This averages $224.43 (rounded up from the tenth of a cent) an hour. These services were rendered from April 13, 2022 through June 6, 2022, with all

but Four Tenths (.04) of an hour of billings occurring in April 2022. The court cannot divine anything excessive or unreasonable about counsel for a Trustee assisting the Trustee in working on how to market and sell the real properties which were not listed on the Schedules and which Debtor asserted were in an irrevocable, or even revocable, trust. Looking at the description of the services for which compensation is requested, they all relate to providing legal services to the Trustee, not duplicating what a real estate broker (a separate professional employed, with court approval by the Trustee) or the duties of the Trustee in administering property of the Bankruptcy Estate.

Based on the evidence provided, the time spent and fees billed (the court discusses the billing rate question below) are reasonable. These were necessary services which the counsel for the Trustee reasonably and necessarily provided.

Case Administration

The fees for these services total $247.50, for which there are stated 1.10 hours billed. *Id*. This averages $225 an hour. Reviewing the descriptions of services, these are all services which were necessary and reasonable for counsel for a Chapter 7 trustee. These all relate to "legal work" and are not doing the duties of the Trustee in administering this case.

Based on the evidence provided, the time spent and fees billed (the court discusses the billing rate question below) are reasonable. These were necessary services which the counsel for the Trustee reasonably and necessarily provided.

Litigation and Contested Matters

The fees for these services total $13,680.00, for which there are stated 55.10 billable hours. *Id*. at 2-4. This averages $248.38 (rounded up from the tenth of a cent) an hour. The time period for these billings commences on January 26, 2022 and end on November 3, 2022.

Reviewing the Litigation and Contested Matters items, these consist substantially of the following: settlement communications, issues relating to the Debtor's trust, issues relating to Debtor obtaining a discharge, multiple motions for conversion of the case sought by the Debtor, seeking turnover of property to the Trustee, and reviewing proofs of claims. Significant work relates to the Motions to Convert this case, good faith, and Chapter 13 eligibility requirements.

Looking at the hours billed, most were billed by the "junior biller," Ms. Kutsuris. For Mr. Cunningham's billings, his being at $495 an hour, most are for one or two tenths of an hour. For this category, Mr. Cunningham's hours billed total nine (9) hours of the 55.10 hours billed in this category. This represents 16.33% of the total hours billing in this category.

Included in the nine hours billed, three (3.00) hours were billed for preparing for and attending hearings at the court. These were for the turnover motion and the two conversion motions.

Based on the evidence provided, the time spent and fees billed (the court discusses the billing rate question below) are reasonable. These were necessary services which the counsel for the Trustee reasonably and necessarily provided.

Asset Analysis and Recovery

The fees for these services total $3,858.00, for which there are stated 16.20 billable hours. *Id*. at 4-5. This averages $238.15 (rounded up from the tenth of a cent) an hour. The time period for these billings commences on January 20, 2022 and end on August 24, 2022. All of the services hours were billed by Benjamin Tagert, with an hourly rate of $225, except for 0.40 hours billed by Ms. Kutsuris, with an hourly rate of $195.

The billings include reviewing the Debtor's trust documents, communicating with the Trustee about how to structure a settlement with both the Debtor and Tri Counties Bank, addressing with the Trustee issues relating to a "buyback" of the equity by the Debtor and alternatively marketing the property for sale, communicating with Debtor's counsel about the sale of the property, confirming with the Broker that the Debtor was not attempting to market the property, and communications with Russell Cunningham (the senior counsel), for which there is no time billed by Mr. Cunningham for these communications. These communications total 2.30 hours of Mr. Tagert's total billings of 15.80 hours billed. This is 16.6% of the 15.80 hours billed by Mr. Tagert. This is not an unreasonable amount of communication by Mr. Tagert, a junior attorney working on this case, with Mr. Cunningham, the senior attorney representing the Trustee.

Further, looking at the descriptions of the work done, communications described, and

issues being addressed, based on the evidence provided, the time spent and fees billed (the court discusses the billing rate question below) are reasonable. These were necessary services which the counsel for the Trustee reasonably and necessarily provided.

Asset Disposition

The fees for these services total $625.50, for which there are stated 2.9 billable hours. *Id*. at 5. This averages $155.69 (rounded up from the tenth of a cent) an hour. The services in this category blend in with those in the "Asset Analysis and Recovery" category. The vast majority of the time billed consists of 0.10 hour billings for the services which were communicating with the broker, Trustee, Mr. Cunningham (0.6 hours billed for communication to/with Mr. Cunningham, with no corresponding time billed by Mr. Cunningham), and Debtor's counsel.

Based on the evidence provided, the time spent and fees billed (the court discusses the billing rate question below) are reasonable. These were also necessary services which the counsel for the Trustee reasonably and necessarily provided.

Fee/Employment Applications

The fees for these services total $427.50, for which there are stated 1.70 billable hours. *Id*. at 5-6. This averages $251.47 (rounded up from the tenth of a cent) an hour. These represent the reasonable and necessary hours in complying with the Bankruptcy Code for the Trustee to obtain authorization to obtain the employment of professionals.

Based on the evidence provided, the time spent and fees billed (the court discusses the billing rate question below) are reasonable. These were necessary services which the counsel for the Trustee reasonably and necessarily provided.

Claims Administration and Objections

The fees for these services total $135.00, for which there are stated 0.60 billable hours. *Id*. at 6. This averages $225.00 an hour. These relate to communications concerning the claim of Tri Counties Bank.

Based on the evidence provided, the time spent and fees billed (the court discusses the billing rate question below) are reasonable. These were also necessary services which the counsel for the Trustee reasonably and necessarily provided.

Settlement/Non-Binding ADR

The fees for these services total $427.50, for which there are stated 1.90 billable hours. *Id*. at 6. This averages $225.00 an hour. These relate to communications between Trustee's counsel, Debtor's counsel, Tri Counties Bank's counsel relating to a possible "buyback" agreement with Debtor.

Based on the evidence provided, the time spent and fees billed (the court discusses the billing rate question below) are reasonable. These were also necessary services which the counsel for the Trustee reasonably and necessarily provided.

**Allegation of Duplication of Service**
**Provided by Trustee's Former Counsel**

The Debtor asserts that the 55.70 hours billed for "Litigation and Contested Matters" and "Claims Administration and Objection" are duplicative of work done by Trustee's Former Counsel, directing the court to read Exhibit A, p. 3-4, presented by Debtor. Exhibits A, Dckt. 222, provided by Debtor is former counsel's Application for Compensation. Pages 3 and 4 of the Application by Former Counsel discusses reviewing Debtor's Schedules, comments about Debtor's trust, information about undisclosed assets from creditor counsel, and employment of a real estate broker.

Debtor does not explain how this is duplicative of the work done by DNLC as counsel for the Trustee. Debtor does not assert what was "replowed ground" and recreated work done by Former Counsel that could have just been picked up and used. Debtor does not provide the court with the detailed billing information by Trustee's Former Counsel and match up duplicate work that was unnecessary to be performed by DNLC.

With respect to the Settlement/Non Binding and Asset Disposition fees, again, Debtor argues that this 4.8 hours of work represents what had been done before with Trustee's Former Counsel. Again, Debtor does not provide the court with any work done by Former Counsel that could have just been picked up and used.

Debtor's argument appears to be more that because the Trustee found it necessary to hire new counsel, the new counsel had to be "deaf, mute, and blind" and not allowed to investigate,

18

communicate, or advocate for the Trustee on anything that Former Counsel may have done, unless the new counsel was willing to do it for free. Debtor offers no legal authority for such a contention.

Debtor's contention that the work done was merely duplicative of what had been done before, and effectively of no value to the Trustee or the Bankruptcy Estate, is without merit – either based on the law (for which no authority has been provided by Debtor) or the facts.

The court's conclusions from its review of the billing detail are that all of the services provided were necessary and reasonable, both in time and amount. Though there may have been some necessary "getting up to speed" time spent by counsel, from the detailed billing information such is minimal in both time and cost.

Based on the evidence provided, the time spent and fees billed was for reasonable and necessary services which DNLC provided for the Trustee as the successor counsel in this Bankruptcy Case.

**Billing Rates**

Debtor takes exception to the Application for Fees, asserting that the Application to Employ DNLC fixes billing rates for Mr. Cunningham and Ms. Kutsuris. As addressed above, the court did not fix the hourly rates when authorizing the employment of counsel. Even if fixed, they would be subject to review under 11 U.S.C. § 328 based upon new information learned and presented to the court.

Debtor does not offer evidence that the hourly rates billed by Mr. Cunningham and Ms. Kutsuris were not reasonable for attorneys of their skill level and experience. Rather, just that Debtor thinks that the rates should be locked in.

In considering the billing rates of $450 and $495 for Russell Cunningham and $195.00 for Ms. Kutsuris, the court concludes that both are reasonable and consistent with the rates for attorneys of similar skills and experience. Mr. Cunningham is an experienced attorney, with more than three decades of representation of parties, including trustees, in the Eastern District of California (The court's current electronic file data base shows Mr. Cunningham appearing on cases since 1989). Mikayla Kutsuris, as reported by the State Bar website, was admitted to

practice in the State of California November 19, 2021.[3]  A $195.00 an hour  billing rate for a first year attorney is consistent with the fees charged by similar attorneys in this area for this level of work.

The court has not been presented with evidence or information indicating that the billing rates of $495.00 and $195.00 are not reasonable and consistent with those charged by attorneys of comparable experience for the types of legal services provided.

No exception was stated to the $225.00 an hour billing rate charged by Benjamin Tagert, who is an attorney reported on the State of California Bar website as having been admitted to practice in February 2020.[4]  A $225.00 hourly billing rate for a third year attorney is consistent with the fees charged by similar attorneys in this area for this level of work.

### FEES, COSTS, AND EXPENSES ALLOWED

A review of the application shows that DNLC's services for the Estate include expending time with Debtor's real property, attempts to turnover the property, litigation and contested matters, and possible buyback agreements. The court finds, under the unique facts and circumstances surrounding this case and numerous contested matters, the services were beneficial to Client and the Estate and were reasonable.  The court finds that the hourly rates are reasonable, the services provided were reasonable, and that DNLC effectively used appropriate rates for the services provided.

**Fees**

Upon review of the length history of this bankruptcy case, and the unique facts and circumstances surrounding the contested matters,

First and Final Fees in the amount of $20,215.50 are approved pursuant to 11 U.S.C. § 330 and authorized to be paid by the Chapter 13 Trustee from the available estate funds in a manner consistent with the order of distribution in a Chapter 13 case.

**Costs And Expenses**

---

[3]  https://apps.calbar.ca.gov/attorney/Licensee/Detail/339777.

[4]  https://apps.calbar.ca.gov/attorney/Licensee/Detail/330242.

1    First and Final Costs in the amount of $520.92 are approved pursuant to 11 U.S.C. § 330

2  and authorized to be paid by the Chapter 13 Trustee from the available estate funds in a manner

3  consistent with the order of distribution in a Chapter 13 case.

4    The court authorizes the Chapter 13 Trustee to pay 100% of the fees and 100% of the

5  costs allowed by the court.

6    DNLC is allowed, and the Chapter 13 Trustee is authorized to pay, the following amounts

7  as compensation to this professional in this case:

8    Fees                $20,215.50

9    Costs and Expenses    $520.92

10    The court shall enter a separate order granting the relief as provided for in this

11  Memorandum Opinion and Decision.

12  **Dated:** May 14, 2023                    **By the Court**

13

14

15

16  Ronald H. Sargis, Judge
    United States Bankruptcy Court

17

18

19

20

21

22

23

24

25

26

27

28

21

# Instructions to Clerk of Court
### Service List - Not Part of Order/Judgment

**The Clerk of Court is instructed to** send the Order/Judgment or other court generated document transmitted herewith *to the parties below.* The Clerk of Court will send the document via the BNC or, if checked _____, via the U.S. mail.

| Debtor(s) | Attorney(s) for the Debtor(s) (if any) |
|---|---|
| **Bankruptcy Trustee** (if appointed in the case) | Office of the U.S. Trustee<br>Robert T. Matsui United States Courthouse<br>501 I Street, Room 7-500<br>Sacramento, CA 95814 |
| **Attorney(s) for the Trustee** (if any) | |